## PEOPLE *v.* SILVER.

1. AUTOMOBILES — NEGLIGENT HOMICIDE — INSTRUCTIONS — DIVIDED STREET—INTERSECTIONS.

   In prosecution for negligent homicide wherein decedent was a pedestrian either on or west of westerly crosswalk of north and south boulevard with 50-foot traffic lanes. separated by a 53-foot parkway and defendant was a westbound motorist on an undivided street paved 40 feet wide and it appears defendant entered easterly crosswalk with traffic light in his favor, it was error to charge jury that if defendant entered westerly traffic lane of boulevard after signal light had changed he was guilty of negligence as a matter of law in the absence of statute or ordinance providing that a crossing of a divided street with an undivided street shall constitute two intersections (1 Comp. Laws 1929, § 4693, subd. [p], § 4700, subds. [b. c], as amended by Act No. 318, Pub. Acts 1939).

2. CONSTITUTIONAL LAW—CONSTRUCTION OF STATUTES.

   Statutes applicable to criminal matters may not be extended beyond their plain terms by judicial construction to include those acts which possibly should be, but are not, within the terms of the statute.

3. AUTOMOBILES — NEGLIGENT HOMICIDE — INSTRUCTIONS — DIVIDED
STREET—CHANGE OF TRAFFIC LIGHT.

> In prosecution of motorist for negligent homicide claimed to
> have been committed as he was about to leave the crossing
> of the westerly traffic lane of a boulevard on an undivided
> street, jury should have been instructed that if defendant
> entered easterly side of boulevard with traffic light in his
> favor the ordinary rules of negligence and the law of the road
> should be applied in determining whether or not entry of de-
> fendant on westerly lane after traffic light had changed consti-
> tuted negligence (1 Comp. Laws 1929, §§ 4693, subd. [p],
> 4700 [b, c], as amended by Act No. 218, Pub. Acts 1939).

BUTZEL, J., dissenting.

Appeal from Recorder's Court for the City of Detroit, Traffic and Ordinance Division; Murphy (George T.), J. Submitted April 16, 1942. (Docket No. 76, Calendar No. 41,668.) Decided July 1, 1942.

Paul W. Silver was convicted of negligent homicide. Reversed, and new trial granted.

*William M. Donnelly, William E. Tarsney,* and *Ray R. Cashen,* for appellant.

*Herbert J. Rushton,* Attorney General, *Edmund E. Shepherd,* Solicitor General, *William E. Dowling,* Prosecuting Attorney, and *Ralph E. Helper, Norton N. Wisok,* and *Ralph B. Taylor,* Assistants Prosecuting Attorney, for the people.

NORTH, J. Paul W. Silver, charged with negligent homicide, was tried by a jury, convicted and sentenced. He has appealed, and the first question raised in his brief is this: "Is an intersection formed by an undivided roadway and a divided roadway two intersections for the purposes of traffic light ordinances and statutes?"

For reasons hereinafter noted the answer to this question is important in the instant prosecution.

The case was tried and submitted to the jury by the trial judge on the theory that in crossing a boulevard a vehicle in effect passes through two intersecting streets, instead of one. In the court's charge to the jury this phase of the law was stated as follows:

"A driver of a car must always use due care, but in a case like Washington boulevard, where there are two strips of pavement, one for traffic going this way and one for traffic coming this way, and it is divided by an island, so-called, or a piece of ground or anything else so that it separates those two strips of pavements, then that is considered two intersections, and assuming that you, say, cross the first strip on the green light or you enter on the green light or amber light—you are too close to stop on the amber light—you must apply the same ruling for the next strip. If you have got a red light before you get to the next strip, you have got to stop, or if the amber light comes on so that you may be reasonably expected to stop, you have got to stop. In other words, treat those two strips of pavement as two separate streets and apply the same rule."

The factual situation of this phase of the case must be noted. About 9:20 p.m., March 22, 1940, defendant was driving his automobile west on Grand River avenue in Detroit. He drove his car across the intersection of Washington boulevard and, either in the crosswalk area on the westerly side of the boulevard or slightly west of the crosswalk, he struck and fatally injured a pedestrian. In the locality of this intersection Grand River avenue is an undivided paved street, 40 feet wide from curb to curb; and Washington boulevard is a divided paved highway, running north and south, the roadway on each side of the boulevard being 50 feet wide, with a parkway 53 feet in width between the two roadways. There is a traffic light on each of the four

corners of Grand River avenue and Washington boulevard.

Defendant testified that he entered the intersection while the green light was on and had proceeded nearly to the westerly side before the light changed to amber. Another witness testified that the light changed while defendant was in the easterly traveled portion of the boulevard. There is no testimony that the light was against defendant at the time he first entered the intersection from the east. He did not stop his automobile in the central portion of the boulevard when opposite the island extending to the north. Instead, he continued to drive in a westerly direction to the point of accident and a few feet beyond. The people claimed, and the trial court held, that, if the traffic light at the northwesterly corner of the intersection turned against defendant prior to the time he passed the center or island portion of Washington boulevard, it was his duty to stop at that point until the light again changed to green or "go." This position on the part of the prosecution and the court was taken upon the theory that the two separate lanes of travel on Washington boulevard are, in effect, two separate streets. On the other hand, the contention of the defendant is that, having entered the boulevard from the east while the light was still with him, he had the right to proceed, though cautiously, until he had completed the crossing of the boulevard, notwithstanding the traffic light changed against him after he entered the intersection. In this respect defendant's contention is based upon his claim that, as a matter of law, in traversing the intersection of this boulevard, he crossed only one street, not two.

For the purpose of decision herein it may be said there is no material difference between the applicable provisions of Detroit ordinances and those of

State statutes.   We quote the following from the statutes:

"The area embraced within the prolongation of the lateral curb lines or, if none, then the lateral boundary lines of two or more highways which join one another at an angle, whether or not one such highway crosses the other";

constitutes an intersection of highways. 1 Comp. Laws 1929, § 4693, subd. (p), as amended by Act No. 318, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 4693, Stat. Ann. 1941 Cum. Supp. § 9.1561).

"(b) Yellow alone or 'caution' when shown together with or following the green or 'go' signal. Vehicular traffic facing the signal shall stop before entering the nearest crosswalk at the intersection, but if such stop cannot be made in safety, a vehicle shall be driven cautiously through the intersection.   *   *   *

"(c) Red alone or 'stop'. Vehicular traffic facing the signal shall stop before entering the nearest crosswalk at an intersection or at such other point as may be indicated by a clearly visible line and shall remain standing until green or 'go' is shown alone." 1 Comp. Laws 1929, § 4700, as last amended by Act No. 318, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 4700, Stat. Ann. 1941 Cum. Supp. § 9.1568).

Admittedly the statute, 1 Comp. Laws 1929, § 4697, subd. (a), as last amended by Act No. 318, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 4697, Stat. Ann. 1941 Cum. Supp. § 9.1565), provides that any person driving a vehicle on a highway shall drive the same at a careful and prudent speed and have due regard for other traffic then and there upon the highway. But we know of no statutory provision or ordinance in the city of Detroit which requires the driver of a motor vehicle, in crossing a boulevard, to stop in the central portion of the boulevard notwithstanding a

traffic light has turned against him after he entered the intersection. Instead, the quoted statute expressly provides that a vehicle so situated "may be driven cautiously through the intersection." It would seem to be inconsistent with the statutory provision and erroneous to hold that the vehicle, after entering with the light or signal, must stop in the center of the intersection and await a change of traffic signals. Nor do we know of any express provision in the law of this State which constitutes the intersection of a boulevard an intersection of two separate highways. It is a matter of common knowledge that the respective sides of a boulevard are not two separate highways. Instead, they bear the same name and the designation of adjacent buildings is the same as on an undivided street, regardless of which side of the boulevard a building may be located.

And it may be further noted that rarely is there a sidewalk along the sides of islands in boulevards but in the sections of the statute last above quoted the requirement to stop is "before entering the nearest crosswalk."

Further, there is no obvious reason why one crossing a boulevard, after having entered the intersection in compliance with traffic signals, should stop in the central portion of the boulevard if there is no approaching cross traffic. Neither the statute nor the Detroit ordinance so requires. In many cases, especially where the line or dividing area of the boulevard is narrow, stopping in the center area might be decidedly hazardous. Our conclusion that the driver of a motor vehicle in passing over the intersection of the boulevard in a legal sense crosses only one street instead of two is in accord with *Kienlen* v. *Holt*, 106 Cal. App. 135 (288 Pac. 866), and *Schmidt* v. *City Ice & Fuel Co.*, 60 Ohio App. 29

(19 N. E. [2d] 514).   A paragraph from the head notes of the latter case reads:

"Where driver of vehicle proceeding towards intersection across a street on which lanes of traffic are separated by a parkway enters intersection with a green light in his favor, he has a right to continue through in a lawful manner, and if while proceeding through such intersection the light changes, when he is opposite such parkway, he is not required to come to a stop opposite the parkway merely because of the existence of the parkway."   (19 N. E. [2d] 514.)

The prosecution attempts to sustain its position by citing *Bartlett* v. *Hammond,* 76 Col. 171 (230 Pac. 109); *Heintz* v. *Schenck,* 176 Wis. 562 (186 N. W. 610); *Geyer* v. *Milwaukee Electric Ry. & Light Co.,* 230 Wis. 347 (284 N. W. 1); and *McCombs* v. *Ellsberry and Fellis,* 337 Mo. 491 (85 S. W. [2d] 135).   At least for the following reasons, and others need not be noted, none of the last above cited cases are in point with the instant case.   None of them involved crossing an intersection controlled by a traffic light or other changing traffic signals. None of them involved the striking of a pedestrian after the motor vehicle had crossed the intersection, as in the instant case.   Instead, each of the four cases just above cited arose from a collision of motor vehicles where one or both of such vehicles were travelling upon a boulevard or divided way. In the instant case it does not appear from the record that there was any other vehicle approaching or crossing defendant's line of travel. We think that decision in each of the four cases cited by the prosecution is controlled by the broader traffic regulation that, at all times, the driver of a vehicle must proceed with reasonable care and caution and have due regard for the rights and safety of others in the lawful use of the high-

way. Obviously, there may be many traffic situations
when because of approaching vehicles one who is
crossing should stop in the middle or opposite the
island portion of a divided thoroughfare. But at
least it is clear that no phase of the law pertaining
to the proper observation of changing traffic signals
was involved in any one of the four cited cases; and
we do not consider them at all controlling of the in-
stant case, notwithstanding in some of them the
court, in substance, referred to the divided thorough-
fare as being the same as two separate streets.

We are mindful that the people prosecuted ap-
pellant on the theory that he was negligent not only
in running a red light, but also in that the brakes
on his machine were defective and that he failed to
keep the proper lookout when driving at the time
and place of the accident; but, nonetheless, defend-
ant and appellant was entitled to a fair trial which,
we think, was denied him because of the error here-
inbefore noted.

We are not in accord with a second contention
made by appellant which, in substance, is that when
an accident occurs outside of the bounds of an inter-
section, the laws regulating the conduct of drivers
within intersections are not applicable. As herein-
before noted, the striking of the pedestrian in the
instant case occurred somewhat westerly and out-
side of the intersection area; and for this reason
appellant asserts that the question of his conduct in
having violated "the laws regulating the conduct of
drivers within intersections," was wholly imma-
terial and irrelevant to the prosecution's case.
Surely, from the standpoint of disclosing by the
testimony whether the injured pedestrian entered
the traveled portion of the boulevard against or with
a traffic light, it was proper to take the testimony
as to the condition of the lights at the time. And,
further, any fact or circumstance attending the hap-

pening of the accident and from which the jury might be aided in determining whether the accident was caused by defendant's negligence would be admissible.

For the reason above indicated defendant's conviction and sentence are vacated and a new trial granted.

CHANDLER, C. J., and STARR, J., concurred with NORTH, J.

BUSHNELL, J. (*concurring*). In concurring in reversal, I think the following should be said. The trial judge in his charge to the jury said in part:

"In other words, treat those two strips of pavement as two separate streets and apply the same rule. And I charge you it is against the law, a violation of the law and an act of negligence to go through a red light, that is, to fail to stop for a red light or to fail to stop for an amber light if it comes on when you are reasonably far back so that you should stop."

This informed the jury that, if the defendant entered the westerly strip of Washington boulevard after the signal light had changed to red, he was guilty of negligence as a matter of law. There is no statute or ordinance which defines the crossing of a divided street or highway with an undivided street or highway as two intersections or provides that such a crossing shall constitute or be considered two intersections. In the absence of such statute or ordinance this portion of the charge was erroneous. Statutes applicable to criminal matters may not be extended beyond their plain terms by judicial construction to include those acts which possibly should be, but are not, within the terms of the statute. *People* v. *Goulding,* 275 Mich. 353.

The jury should have been instructed that, if defendant entered Washington boulevard with a green light, the ordinary rules of negligence and the law of the road should be applied in determining whether or not his entry of the westerly strip of the pavement after the light had changed to red constituted negligence.

I concur in vacating defendant's conviction and sentence and ordering a new trial.

Chandler, C. J., and Boyles, North, Starr, and Sharpe, JJ., concurred with Bushnell, J.

Butzel, J. (*dissenting*). Appellant's question, whether "an intersection formed by an undivided roadway and a divided roadway" constitutes one or "two intersections for the purposes of traffic light ordinances and statutes," may be stated more realistically as follows: Washington boulevard, running north and south in downtown Detroit, consists of two roadways separated by a parkway 53 feet wide. The east roadway is exclusively for north-bound, the west roadway exclusively for southbound, traffic. A westbound motorist on Grand River approaching Washington boulevard from the east is confronted by four automatic traffic lights, two on the east curbs of the east roadway, and two on the west curbs of the west roadway. If as he enters the east roadway the lights are green, but before he enters the west roadway, the lights have changed to red, must he stop in the area on Grand River between the ends of the parkway in Washington boulevard and wait for the lights to turn green again, or may he proceed across the west roadway notwithstanding the red lights, provided no automobile traffic is coming down such roadway from the north?

In considering this appeal, we do not stress the

fact, not shown by the record, that there are side-
walks on both the east and the west sides of the
parkway, as well as down its center. We shall con-
sider the case as if there were no such sidewalks.

While it is true that the statute quoted in Mr.
Justice NORTH's opinion (1 Comp. Laws 1929, § 4700,
subds. (b), (c), as last amended by Act No. 318, Pub.
Acts 1939 [Comp. Laws Supp. 1940, § 4700, Stat.
Ann. 1941 Cum. Supp. § 9.1568]) requires vehicular
traffic facing a yellow or red light to stop "before
entering the nearest *cross*walk" at the intersection,
it could hardly be contended that the absence of a
crosswalk would authorize the driver of a vehicle
facing a yellow or red light to drive into an inter-
section as if the light were green. In a case where
there is no crosswalk defined (1 Comp. Laws 1929,
§ 4693, subd. (p–1), as last amended by Act No. 318,
Pub. Acts 1939 [Comp. Laws Supp. 1940, § 4693,
Stat. Ann. 1941 Cum. Supp. § 9.1561]) as

"(a) That part of a roadway at an intersection
included within the connections of the lateral lines
of the sidewalks on opposite sides of the highway
measured from the curbs, or in the absence of curbs
from the edges of the traversable highway;

"(b) Any portion of a highway at an intersection
or elsewhere distinctly indicated for pedestrian
crossing by lines or other markings on the surface;"

the very farthest a motorist confronted by a yellow
or red traffic light would, as a matter of common
sense and common law, have a right to proceed
would be "the prolongation of the lateral curb lines
or, if none, then the lateral boundary lines"
(1 Comp. Laws 1929, § 4693, subd. [p], as amended
by Act No. 318, Pub. Acts 1939) of the cross street.
See discussion of this problem, which occurs in out-
lying and undeveloped districts of cities and towns,
in Opinions of the Attorney General, 1939–1940, pp.
271, 272.

Thus, even if Justice North's observation, "that rarely is there a sidewalk along the sides of islands in boulevards," were applicable to the islands in Washington boulevard (and the map filed by counsel in this court does not disclose that there is one), nevertheless a motorist would not be authorized to infer, from its absence, a liberty to disregard yellow or red traffic signals plainly visible and intended to govern traffic moving in his direction. The absence of a crosswalk might authorize him to infer that there would be no pedestrian cross traffic for which he should allow room, but, after driving his vehicle even with the edge of the cross street, he would be obliged to stop, in obedience to the light.

Justice North's argument that "there is no obvious reason why one crossing a boulevard, after having entered the intersection in compliance with traffic signals, should stop in the central portion of the boulevard if there is no approaching cross traffic," meaning, no doubt, no approaching *vehicular* cross traffic, amounts to this, that inasmuch as the purpose of yellow and red traffic lights is to protect vehicular traffic on the cross street, when there is no such traffic, the motorist facing such signals ought to be allowed to disregard them. Such a construction ignores the manifest legislative intent to impose an unconditional mandate to stop, independent of the necessity for such stop, corroborated by the common understanding of citizens of this State ever since the introduction of traffic signals; it also assumes that the only purpose of a traffic light is to protect *vehicular* cross traffic. Traffic signals serve the equally important purpose of protecting pedestrian cross traffic, whether crossing on the near or the far side of the cross street, relatively to the vehicular traffic stopped and gov-

erned by such signals. The victim of defendant in the case at bar was a member of the pedestrian cross traffic on the far side of Washington boulevard, relatively to defendant, and the traffic signals facing defendant, which he deliberately disobeyed, were meant for the protection of decedent as well as possible vehicular cross traffic.

When decedent entered the pavement of Grand River avenue, the light being with him, he had a right to assume that he could cross safely. This right was qualified, of course, by a duty to look to his left, to see if any traffic had already entered the intersection on the yellow. It would be reasonable to require him to look as far as the east line of the west lane of Washington boulevard (a distance of 50 feet), but to require him to look as far as the east line of the east lane thereof (a distance of 153 feet), and, having seen an automobile, then to require him to assume that it would proceed heedlessly toward him and run him down instead of stopping opposite the parkway when the light for it became red, would be requiring such pedestrian to assume the unreasonable, and would, therefore, be itself unreasonable as a rule of conduct.

As Justice North points out, "where the line or dividing area of the boulevard is narrow, stopping in the center area might be decidedly hazardous." No such case, however, is presented by this record. Obviously, the parkway or other dividing area ought to be wide enough to accommodate a vehicle in safety before the law should require its driver, upon change of traffic light, to stop opposite such area. In the case at bar, the area was wide enough to accommodate at least three vehicles of ordinary length in a row.

Justice North enumerates three grounds for distinguishing the four cases cited by counsel supporting the prosecution from the case at bar:

1. "None of them involved crossing an intersection controlled by a traffic light or other changing traffic signals."

2. "None of them involved the striking of a pedestrian after the motor vehicle had crossed the intersection, as in the instant case."

3. "Instead, each of the four cases * * * arose from a collision of motor vehicles where one or both of such vehicles were traveling upon a boulevard or divided way."

The second and third grounds of distinction are equally applicable to the two cases, cited by counsel and relied on by Justice North, supporting defendant; hence they may both be disregarded as factors affecting decision herein. The first ground of distinction is equally applicable to *Kienlen* v. *Holt,* 106 Cal. App. 135 (288 Pac. 866). This leaves only one case, *Schmidt* v. *City Ice & Fuel Co.,* 60 Ohio App. 29 (19 N. E. [2d] 514), indistinguishable from the case at bar on the ground that traffic lights were involved, supporting defendant.

A case from a foreign jurisdiction, especially when decided only by an inferior tribunal thereof, has controlling force when cited to this court only by virtue of its appeal to reason and public policy. In rendering its decision, the court of appeals for Hamilton county, Ohio, did not cite any authority either judicial or statutory for its conclusion that the streets in question constituted a single intersection, but only observed, parenthetically, that the crossing of Liberty street (the undivided road) and Central Parkway (the divided road) "is *an* intersection of two streets within the meaning of both municipal and State laws." Research into the statute

law of Ohio has failed to disclose any legislative
enactment of that State (prior to 1941, when it
adopted the uniform traffic law, Ohio General Code,
§§ 6307–1—6307–11, defining "intersection" in
§ 6307–2) in force at the time that case was decided
or at any previous time, giving a definition of the
term *intersection.* Other terms of significance in the
regulation of traffic had been defined by statute prior
to 1941 (see Ohio General Code, § 6290), but not
*intersection.* The Ohio Appeals decision appears,
therefore, to rest at least in part upon a misconcep-
tion of the law of the State of Ohio,—a fact which
certainly does not give it strength when it is cited
as an authority to this court.

Stronger and more persuasive authority, and sup-
porting the proposition that the crossing of a divided
highway by an undivided one forms two separate
intersections, is to be found in a line of cases decided
by the supreme court of errors of Connecticut.
*Mathis* v. *Bzdula,* 122 Conn. 202 (188 Atl. 264); *Beck*
v. *Sosnowitz,* 125 Conn. 553 (7 Atl. [2d] 389); *Wilson*
v. *M. & M. Transportation Co.,* 125 Conn. 36 (3 Atl.
[2d] 309).

In *Mathis* v. *Bzdula, supra,* it was held that where
two roads came together in the shape of a Y, and
in the center of the area of their confluence there
was a small circular grass plot, there were in effect
three separate intersections. Where the layout was
identical, except that the grass plot was triangular
instead of circular in shape, it was again held that
there were three separate intersections in *Beck* v.
*Sosnowitz, supra.* In Connecticut, there is no statu-
tory definition of intersection, and the supreme
court of errors had already given a common-law
definition of the term as meaning the space common
to both of the intersecting highways in *Neumann* v.
*Apter,* 95 Conn. 695 (112 Atl. 350, 21 A. L. R. 970).
In applying this definition to the unusual geometry

involved in the *Mathis* and *Beck Cases,* the court stated that regard must be had to the course which traffic passing in the various directions through the crossing may normally be expected to take. The concept that emerges from these two decisions is a realistic one: it emphasizes that the intersection which is of importance to the law is the crossing of lines of travel (dynamic) rather than a mathematical formula arrived at by deduction from the ordinary physical properties of regularly laid out streets (static). In this sense, the intersection of Washington boulevard and Grand River avenue is not one but two, since there are two separate areas in which lines of traffic cross, separated by another area (the portion of Grand River lying between the parkways) which, like any street not within an intersection, is used for lines of travel parallel to each other, but not intersecting each other. The Michigan statutory definition of intersection, though couched in mathematical terms ("The area embraced within the prolongation of the lateral curb lines or, if none, then the lateral boundary lines of two or more highways which join one another at an angle, whether or not one such highway crosses the other"), ought to be read in the light of the realistic approach indicated by the common-law decisions, such as those of Connecticut, just cited.

The facts of *Wilson* v. *M. & M. Transportation Co., supra,* are, in all material particulars (including the presence of traffic lights), as similar to those of the case at bar as could be desired. Plaintiff was driving north on Lafayette street, an undivided highway which crossed Railroad avenue, a highway divided, not by a parkway, but, by an elevated railroad embankment. Lafayette street went through the embankment beneath a viaduct, beneath which

there was a traffic light. Plaintiff passed this light when it was green, but it changed to red before he emerged from beneath the viaduct into the north lane of Railroad avenue, where he collided with defendant's truck. Connecticut statutes gave the right of way to traffic favored with a green light upon entering the intersection; consequently, the determination as to which party had the right of way depended upon the answer to the question, ''What is the correct definition of the limits of this intersection?'' The court said:

''The court charged that 'the intersection    *    *    * is that space which lies between the curb lines of the two streets projected,' and proceeded to indicate on the map in evidence what this area was. What the court indicated is not clear from the record, but it may be inferred that it was the space common to Lafayette street and the north roadway. We, therefore, accept as correct the plaintiff's statement in his brief that the court 'confined this definition to the area north of the railroad abutment.' Error is assigned as to the charge upon this point, and the plaintiff argues broadly that upon the undisputed facts already recited, the north and south roadways together with the underpass constituted a single street, and that therefore so much of all three as was common to Lafayette street comprised the intersection. He suggests that a contrary rule when applied to the many streets in the State 'divided by so-called esplanades' would 'defeat the very purpose of traffic regulation 75c,' and that 'the railroad abutment in this case is nothing more than one form of esplanade.' Viewed in the light of the recent statement of this court that the mere presence of an open circular area at the junction of two roads 'in effect created separate highways' (*Mathis* v. *Bzdula,* 122 Conn. 202, 205 [188 Atl. 264]) and of the completeness with which the 64-foot thick solid structure

isolated one roadway from the other in the present case, the plaintiff's argument is not convincing. * * *

"There is no error."

We think that the statement of law in the *Wilson Case* is far'preferable, as a matter of public policy, and evidences much more study and reflection, as a matter of preparation, than the *Schmidt Case*. Indeed, the decision of the *Wilson Case* is stronger than that we are required to make if we affirm the conviction in the case at bar, because in that case the motorist proceeding north on Lafayette street, after passing the traffic signal governing the stream of traffic of which he was a part, had no way of knowing, for a distance of 22 feet after passing such signal and before emerging into North Railroad avenue, whether the color of the light had changed against him. In that case it did change, yet, though he could not know such fact, he was held responsible therefor by the supreme court of errors, which had to content itself with a criticism of the peculiar placing of the signal (in the middle of the island) as a departure from the legislative purpose. *Wilson v. M. & M. Transportation Co., supra*. In the case at bar, there was no such hardship upon defendant motorist. The light governing him was conveniently placed on the far side (relatively to him) of Washington boulevard, where he could observe without difficulty its every change. He chose to disregard its unequivocal command. He should be prepared to take the consequences.

The California Appeals decisions are well distinguished from *Bartlett* v. *Hammond*, 76 Col. 171 (230 Pac. 109), on the ground that the California statute defined the term *intersection* as the area embraced within the prolongation of the property lines of the streets involved. *Kienlen* v. *Holt, supra*.

Obviously, there are no property lines along the sides of islands in boulevards, and the definition referred to would require the conclusion that the intersection of a divided road by an undivided one be regarded as single rather than double. The Michigan statute, which refers to curb lines, practically spells out the result contended for by the people in the case at bar, because the islands in Washington boulevard are bounded by curbs.

In the last analysis, the eminent requirement of the law is that motorists and pedestrians alike abide by the dictates of reason and common sense in their use of the highways. The latter, in the case presented by this record, call unequivocally for affirmance.

In his brief defendant quotes from the following ordinance of the city of Detroit (No. 115-D, § 17):

"The operator of a vehicle intending to turn to the left within an intersection of divided or undivided roadways, shall yield the right of way to any vehicle approaching from the opposite direction which is within the intersection or so close thereto as to constitute an immediate hazard, but said operator having so yielded and having given a signal as required by this ordinance, may make such left turn and the operators of all other vehicles approaching the intersection from said opposite direction shall yield the right of way to the vehicle making the left turn: Provided, That at an intersection at which a traffic signal is located, an operator intending to make a left turn shall permit vehicles bound straight through in the opposite direction to pass through the intersection before making the turn, and that when such left turn is intended from a divided roadway it shall be completed only when the green signal permits movement through the intersection of the highway being entered."

Careful consideration of this ordinance, especially the proviso, leads to the conclusion that, in its municipal legislation, the common council of the city of Detroit treats the crossing of a divided by an undivided street as two intersections rather than one. The use of the word *intersection* in the singular in the phrase "intersection of divided or undivided roadways" does not militate against this conclusion, when it is remembered that there the word is used in a generic rather than a quantitative sense. More important than verbal considerations is the practical requirement imposed by the ordinance. According to the proviso, this is seen to be as follows: If defendant Silver had been driving north in the east lane of Washington boulevard approaching the intersection thereof with Grand River, and had commenced the execution of a left turn while the green light was facing Washington boulevard traffic, he would have had to stop in the area between the islands and await the changing of the traffic light before he could have legally entered the west lane of the boulevard in order to cross it to proceed further on Grand River. The necessity for such precaution is self-evident. Can it be argued that such necessity is any less obvious when, instead of approaching the intersection of the east lane of Washington boulevard and Grand River upon the former from the south, and turning left onto Grand River, one approaches the same intersection on Grand River from the east, and simply proceeds through on a favorable light, but observes a change of light before entering the west lane of the boulevard? In either case, does not elemental safety require that the motorist await a green light facing Grand River traffic before attempting to enter and cross the west lane of the boulevard? That the common council has expressly answered the question in

the left-turn situation but has not done so in the
straight-through situation is no justification for in-
voking the principle *expressio unius exclusio
alterius*. Rather is it to be presumed that, since the
latter situation is so much more obvious than the
former, that the common council thought legislation
on the subject unnecessary.

We do not share Justice NORTH's feeling that the
four cases cited for the people are distinguishable.
The absence of traffic signals therein does not
derogate from the fact that in each of them the
court was called upon to answer, and did answer, the
very question raised herein, namely: Where an un-
divided way crosses a divided one, how many inter-
sections are formed? If the answer is two for the
purposes of other rules of traffic law, is there any
reason why it should be different for the purpose of
the rule involved in the case at bar? We perceive
none.

In *Bartlett* v. *Hammond, supra,* where a north-
south divided roadway was crossed by an east-west
undivided roadway, the plaintiff motorist, west-
bound on the latter roadway, turned left into the
west (southbound) lane of the divided road, and
struck defendant's vehicle, plaintiff was guilty of
contributory negligence since he had not kept to the
right of the center of the intersection of the medial
line of the west lane of the boulevard and the medial
line of the undivided road. Plaintiff argued that
the double crossing was only one intersection, and
that the medial line of the boulevard ought to be
taken as a line bisecting the island in its center.
The court overruled this contention, and held that
for the purposes of the traffic rule involved, there
were two intersections, and each lane of the boule-
vard was to be treated as a separate street with its
own medial line.

The other three cases, *McCombs* v. *Ellsberry and Fellis*, 337 Mo. 491 (85 S. W. [2d] 135), *Heintz* v. *Schenck*, 176 Wis. 562 (196 N. W. 610), and *Geyer* v. *Milwaukee Electric Ry. & Light Co.*, 230 Wis. 347 (284 N. W. 1), are all cases of the following factual pattern. A divided roadway, or boulevard, was crossed by an undivided street. One of the motorists would enter the intersection formed by one of the lanes of the boulevard and the undivided street, and, proceeding on the undivided street, would then enter the intersection formed by the other lane of the boulevard and the street on which he was driving, where he would collide with a vehicle driven into the latter intersection from the other lane of the boulevard. Invariably the latter vehicle would be the first to enter the second intersection, but the driver first mentioned would contend that the two intersections were in law but one, so that, in consequence, it was *he* who had entered the intersection first and had the right of way. Invariably, too, this contention was overruled, and the configuration declared to be two separate intersections. The very fact that there were no traffic lights involved in these cited cases makes them stronger authority for affirming the instant case.

We are in accord with the opinion of the attorney general (Opinions of the Attorney General, 1939–1940, pp. 271, 272) wherein the question was discussed, and the ruling was:

"Notwithstanding the absence of crosswalks or clearly visible lines, the section in question makes it the duty of vehicular traffic facing the signal to stop before entering the intersection and to remain standing until green or 'go' is shown. To construe the section under consideration otherwise would be to nullify the purpose of the legislation and continue a hazard to traffic which existed prior to its enact-

ment and constituted one of the reasons, if not the · sole reason, for the legislation as expressed in the subsection under consideration.''

The judgment of conviction should be affirmed.

WIEST, J., took no part in this decision.